IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICK LEON,

        Plaintiff,

vs.                                     No. CIV 07-0467 JB/WDS

MIKE KELLY and GARY GOODMAN,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion to Exclude Testimony of Thomas Burrage, filed November 12, 2008 (Doc. 63)("Burrage Motion"); (ii) the Plaintiff's Motion to Exclude Testimony of Karen Marcotte, filed November 12, 2008 (Doc. 64)("Marcotte Motion"); and (iii) the Plaintiff's Motion to Exclude Testimony of Paul Silverman, filed November 12, 2008 (Doc. 65)("Silverman Motion").  The Court held a Daubert[1] hearing on December 2 and 3, 2008.  The Defendants retained three expert witnesses for this case.  The primary issue is how much of the expert testimony of these witnesses is admissible at trial.  Because the Court concludes that each of the Defendants' experts are qualified in their respective fields, and have employed reliable methodologies, using sufficient data, the Court will allow the experts to give the majority of their opinions at trial.  Each expert, however, has some opinions that cannot be given as expert testimony: (i) Thomas Burrage will not be allowed to testify that Plaintiff Rick Leon was required to mitigate his damages or make legal conclusions about Leon's calculations; (ii) Karen Marcotte will not be allowed to testify, as an expert, that she considered Leon to be a consultant to the Defendants, and not their partner; and (iii) Paul Silverman will not be allowed to testify that Leon

---

[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.  579 (1993).

should have known that. in New Mexico, real estate agreements are legally required to be in writing. Accordingly, the Court will grant in part and deny in part each of the three motions to exclude.

## **FACTUAL BACKGROUND**

This case arises out of a dispute over the acquisition and development of the Winrock Center, a shopping mall, in Albuquerque, New Mexico. America's Place Partners LLC, a company that Defendants Gary Goodman and Mike Kelly formed, purchased the Winrock Center. Leon contends, however, that he and Kelly were in a partnership whose purpose was to buy the Winrock Center, and that Kelly and Goodman froze him out of the deal. The Court has already discussed much of the background of this case in greater detail elsewhere. See Memorandum Opinion and Order at 1-6, entered October 23, 2008 (Doc. 59). No further facts are necessary for the resolution of these motions, which involve the admissibility of the testimony of the three expert witnesses the Defendants have retained.

It is useful, however, for the Court to reiterate a few facts that it has previously discussed to provide some context. During the time that Leon worked with Kelly and Goodman, Leon was responsible for developing certain portions of a presentation binder. This presentation binder was a document of over 250 pages describing aspects of the Winrock Center project that was given to prospective investors and lenders. Leon produced a development plan and sketch, similar to a building plan and blueprints, that was included in the binder, which laid out certain details of the proposed project. Leon also produced pro forma, which are essentially budgetary calculations and projections. After Leon was allegedly frozen out of the deal, Leon produced damages calculations that he contends measure how much he would have made from the venture had he been included. These three sets of documents -- the development documents, the pro forma, and the damages calculations -- are the subjects of the experts' testimony.

## PROCEDURAL BACKGROUND

While Leon has elected not to designate any expert witnesses for this case, the Defendants have named three: (i) Burrage, a forensic accountant whose report deals with Leon's damages calculations; (ii) Marcotte, a professional land planner whose report discusses Leon's development plan and development sketch; and (iii) Silverman, a real estate developer whose report analyzes Leon's pro forma. All three experts prepared reports pursuant to rule 26 of the Federal Rules of Civil Procedure and have been deposed by Leon. Leon filed motions to exclude various opinions and conclusions that each of the experts made in their reports.

### 1. **Burrage's Rule 26 Expert Report.**

Burrage is a forensic accountant and business valuation expert the Defendants retained. In his expert report, Burrage writes that he was retained to analyze Leon's damages computations and issue a report. See Exhibit 1 to Burrage Motion at 2 (dated August 29, 2008)(Docs. 63-2 & 63-3)("Burrage Report"). Burrage was also retained to analyze and respond to any experts other parties to the case might retain, a moot point given Leon's decision to forgo expert testimony. Burrage relied upon a variety of materials in preparing his report, including: (i) interviews with Kelly and the Defendants' attorneys; (ii) Leon's damages calculations; (iii) excerpts of Leon's deposition testimony pertaining to damages calculations; (iv) various Grubb & Ellis[2] historical trends; (v) U.S. Geological Survey statistics on commodities; and (vi) news reports on the meltdown of the subprime mortgage market. See Burrage Report at 1-2.

Burrage makes several broad conclusions in his report. First, he concludes that Leon's damages calculations are speculative. Burrage explains that in late 2007 "the collapse of the

---

[2] Grubb & Ellis is a real estate management, consulting, and investment company.

subprime mortgage market was spilling over into other credit markets . . . making credit much more difficult to obtain.  That instability then began to impact the equity market as well."  Id. at 3.  Burrage concludes that these events have impacted "the ability to sell single family dwellings and to lease office and retail space."  Id.  At a minimum, Burrage states, these events will slow sales and leasing, increasing carrying costs and reducing profitability.  See id. at 3-4.  The financial market collapse, Burrage asserts, was compounded by rising commodities and construction costs that "may impact the overall profitability of the project itself."  Id. at 4.  Burrage also concludes that Leon's projection of an additional 1,000,000 square feet of office space would, given the absorption rate for office space in uptown Albuquerque, "represent a 132.9 year supply of space."  Id.  In his final basis for the speculative nature of Leon's damages calculations, Burrage concludes that Leon's office-lease rate is overly optimistic and is not likely to be reached until at least 2014.  See id.

Second, Burrage concludes that Leon's calculations omit costs that would be associated with generating his hypothetical revenue streams.  According to Burrage, Leon's estimates fail to account for five different costs: (i) costs for due diligence -- such as legal and accounting fees, and engineering and environmental studies -- that must be completed before acquiring property; (ii) costs for the acquisition of the property, including surveys, title insurance, and closing costs; (iii) due diligence costs to attract investors, which includes such expenses as commissions, promotional material, and travel and entertainment costs; (iv) due diligence costs for obtaining financing; and (v) variable costs to cover the ongoing costs of operating his proposed partnership or for serving tenants.  See id. at 5-6.

Burrage next notes that it would not make economic sense to pay a partner a development fee, leasing commission, or any other compensation before a project begins generating taxable income.  Such payments, Burrage states, would convert tax-free investments or loans into taxable

income, incurring unnecessary tax liability.  See id. at 6.  Burrage then concludes that Leon used an inappropriate discount rate when converting his projected income stream into present value dollars. Leon used a discount rate of five percent, but Burrage concludes that, for this project, the discount rate applied to calculate the present value of any earnings stream should be at least twenty-five percent.  See id. at 7.  Burrage's final opinion is that Leon failed to reduce his damages projections to account for the mitigation from alternative projects Leon would be able to undertake.  See id. Ultimately, Burrage gives his opinion that "Leon's cost projections and hypothetical lost profits analysis are unreliable, speculative and not based on the existing real estate and investment environment."  Id. at 8.

### 2.    Motion to Exclude Burrage.

Leon moves to exclude Burrage's testimony on four grounds: (i) that he is not qualified to give the opinions he has offered; (ii) that his opinions are not based on sufficient data; (iii) that his methodology is unreliable; and (iv) that some of his opinions impermissibly state legal conclusions. On his first basis for exclusion, Leon argues that Burrage is a forensic accountant, not a real estate appraiser, an economist, or a contractor.  See Burrage Motion at 3.  Leon argues that Burrage would need expertise in these areas for some of the opinions he offers.  Specifically, Leon contends that Burrage's opinions on the effect of the collapse of the subprime mortgage market requires economics expertise.  See id. at 3-4.  Burrage's opinion about rising construction costs, Leon maintains, would be the opinion a construction contractor might offer, but is outside the area of expertise of a forensic accountant like Burrage.  See id. at 4.  Finally, Leon maintains that Leon lacks experience as a developer or realtor, and "knows nothing" about the Grubb & Ellis leasing

rates report, and should therefore not be allowed to testify about Leon's leasing rates projections.[3] Id. at 5.

On his second basis for exclusion, Leon argues that Burrage's expert opinions were based solely on documents that the Defendants' counsel selectively provided to Burrage. Leon maintains that Burrage's testimony is thus not founded on a reliable basis. See id. Leon asserts that Burrage lacked sufficient information to form his opinions because the only information he considered was a small amount of counsel-selected material. See id. at 6.

For his third basis for exclusion, Leon attacks Burrage's methodology as unreliable. Leon notes that Burrage testified at his deposition that he did not rely on any accounting treatises, published reviews or journals, and has not done any significant calculations. See id. In particular, Leon faults Burrage for not conducting an independent calculation of Leon's damages. Rather, Leon contends, Burrage has opined only that Leon's damage calculations were incorrect, "without knowing the correct answer." Id.

Leon's final challenge to Burrage's offered testimony is that some of Burrage's opinions state legal conclusions. Leon contends that such legal conclusions should be left to the Court or the jury to decide, especially "in light of the fact that Burrage has no legal background whatsoever." Id. at 7. Leon points out two opinions that he believes are impermissible: (i) Burrage's opinion that Leon's cost estimates are speculative and should be ignored; and (ii) Burrage's opinion that Leon was required to mitigate his damages and that Leon's damages calculations should therefore be reduced.

---

[3] Leon does not tie this issue to any particular opinion, but it seems that Leon is challenging the portion of Burrage's first opinion that discusses the historical lease rates in uptown Albuquerque.

The Defendants' response first sketches out why they retained Burrage and the purpose of his expert testimony. The Defendants note that Leon has not named any experts or sought to have himself designated as an expert. <u>See</u> Response to Motion to Exclude Testimony of Thomas Burrage at 1, filed November 26, 2008 (Doc. 68)("Burrage Response"). Instead, they maintain, Leon's damages calculations are based solely on his own projections about the future profitability of the Winrock Center had his purchase plans been successful. <u>See id.</u> at 4-5. The Defendants state that they retained Burrage, because of his expertise in forensic accounting and business valuation, to assess the reliability of Leon's damages calculations. <u>See id.</u> at 5.

The Defendants argue that the Burrage Motion misstates Burrage's credentials and experience. The Defendants maintain that Burrage has extensive experience doing damages work, that he is a forensic accounting expert, as well as a certified valuation analyst, and that he is accredited in business valuation. <u>See</u> Burrage Response at 6. The Defendants contend that Burrage "is more than 'familiar' with valuing businesses," and that his "experience, his training, and his credentials establish that business valuation is within his area of expertise." <u>Id.</u>

The Defendants next argue that Burrage's testimony is reliable. The Defendants maintain that Burrage relied upon data generated by a variety of sources, such as published authorities about rising construction costs. <u>See id.</u> at 7. The Defendants contend that Burrage may reasonably rely upon the work of experts in other fields in conducting his work and thus need not be a construction expert, realtor, or economist. <u>See id.</u> The Defendants also contend that Leon has ignored the treatises and practice guides that Burrage employed. <u>See id.</u> at 8. Burrage's opinions, the Defendants assert, are grounded in reliable and accepted accounting methodology, which is explained in his expert report. <u>See id.</u> at 8-9.

Finally, the Defendants argue that Burrage's testimony will be helpful to the jury. The

Defendants maintain that, at trial, Leon will have to prove his damages to a reasonable certainty. See id. at 9.  According to the Defendants, Burrage's testimony will help the jurors evaluate Leon's calculations, the bases for those calculations, and the important factors that the Defendants contend Leon failed to take into account in preparing his calculations.  See id. at 9-10.

### 3.    Daubert **Hearing on Burrage.**

At the hearing, Tom Grisham, Leon's counsel, stated that Leon was not questioning whether Burrage was an expert in forensic accounting, see Transcript of Hearing at 8:7-8 (taken December 2, 2008)(Grisham)("I Tr."),[4] but was challenging that some of Burrage's opinions should come from an economist or commercial real estate expert, see id. at 7:5-19 (Grisham & Court).   Burrage described his experience and background, and explained the scope of his expertise.  Burrage testified that forensic accounting was the discipline of valuing business interests, intangible assets, and income streams, which could be used in determining economic damages and lost profits.  See id. at 19:13-18 (Burrage).   Forensic accounting, Burrage explained, is a broad discipline involving disputes or investigations over accounting matters, which embraces business valuation, economic damages, lost profits, and bankruptcies.  See id. at 19:21-20:3.  Burrage testified that Leon's damages calculations would fall within the realm of business valuation.  See id. at 20:7-10 (Eaves & Burrage).  Burrage also testified that he had expertise in economics, and that part of conducting a business valuation involved seeing how a business fit within the economic environment and determining how economic factors would influence the business' profitability.  See id. at 49:23-50:15.

Burrage testified that, in conducting his analysis of Leon's damages calculations, he used

---

[4] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain different page and/or line numbers.

the principles and methods set forth in the American Institute of Certified Public Accountants ("AICPA") practice aid regarding the computation of lost profits.  See id. at 45:12-46:5 (Eaves & Burrage).  The practice aid is a manual the AICPA recently issued -- when Burrage was chairing the AICPA section issuing the manual -- to assist practitioners in the financial and accounting aspects of calculating lost profits.  See id. at 45:18-24 (Burrage); Exhibit A to Hearing, AICPA, Practice Aid 06-04: Calculating Lost Profits (2006).  Burrage also stated that he followed the accounting standards for litigation services, including lost profits and business valuation, laid out in a 2003 practice aid that the AICPA published.  See id. at 61:14-63:22 (Eaves & Burrage); Exhibit B to Hearing, AICPA, Consulting Services Special Report 03-01: Litigation Services and Applicable Professional Standards (2003).  Burrage did not specifically review these practice aids and others on which he relied before writing his report, but testified that he was aware of their contents.  See id. at 88:14-89:24 (Lawless & Burrage); id. at 91:10-21.

After completing his report, Burrage continued to review other materials for the case, including the presentation binder that Kelly and Goodman sent to potential investors, and concluded that the additional materials did not change his opinions.  See id. at 65:6-66:2 (Eaves & Burrage); 119:19-127:2 (Lawless & Burrage).  In particular, Burrage stated that much of the presentation binder involved America's Place Partners LLC, which was a different entity than the hypothetical entities Leon envisaged in his damages calculations and thus were not relevant to Burrage's work. See id. at 138:10-139:10 (Eaves & Burrage).  Burrage also did not think there was any information he needed for his report that he had not received.  See id. at 66:3-5 (Eaves & Burrage); id. at 69:21-70:2 (Lawless & Burrage).  While Burrage studied the entire presentation binder, he did so only after his report was completed, shortly before his deposition.  See id. at 70:13-20 (Lawless & Burrage).

Burrage did not rely entirely on materials that the Defendants' counsel provided, but

conducted some independent research.  See id. at 75:10-17, 77:4-16.  Burrage admitted that he did

not use New Mexico commodities price numbers, because they were unavailable, but stated that

commodity price trends would be similar from region to region within the United States.  See id. at

78:14-80:18.  Burrage also stated that he was unaware that Gerald Martin[5] had done a construction

cost estimate, which Burrage stated that he would have found useful in conducting his analysis.

While Burrage never asked for the estimate, it appears that Burrage -- and the Defendants -- did not

know such an estimate existed.  See id. at 82:11-83:17; id. at 140:13-18 (Eaves & Burrage).  Burrage

stated that he believes he had all the necessary information to conduct his analysis in compliance

with accounting standards.  See id. at 97:6-14, 119:19-127:2 (Lawless & Burrage).  While Burrage

conducted much of his independent research on the Internet, he testified that such an approach was

acceptable and that experts would rely on information gleaned from the Internet.  See id. at 97:22-

98:8.  Although Burrage was not aware of what specific real estate developers in the Albuquerque

area expected for a return on investments, Burrage said that he relied on market reports that were

the gold standard in business valuation for determining capitalization rates.  See id. at 107:11-

111:12.

###    4.    **Marcotte's Rule 26 Expert Report.**

Marcotte is a land-planning professional with twenty-three years experience in Albuquerque.

See Exhibit 1 to Marcotte Motion, Expert Report of Karen Marcotte at 1 (Docs. 64-2 to 64-

4)("Marcotte Report").  Marcotte was hired to provide a variety of opinions centering on the

Winrock Center development plans Leon prepared, including: (i) whether the plans complied with

City of Albuquerque requirements for development in uptown Albuquerque; (ii) whether the plans

---

[5] Gerald Martin is a local construction contractor, the founder and Chief Executive Officer
of Gerald Martin General Contractor.

could receive City of Albuquerque approval; (iii) whether the plans were useful and adequate; and (iv) whether the current developers of the Winrock Center are using Leon's concepts.  See id. Additionally, Marcotte was asked to "provide an opinion about Mr. Leon's role regarding Winrock from October 2006 through March 2007."  Id.  Marcotte reviewed a variety of materials for her report, including: (i) Leon's development sketch; (ii) excerpts from Leon's deposition; (iii) portions of Leon's answers to interrogatories; (iv) pro forma; (v) a phasing diagram; (vi) a market center plan; (vii) Leon's damages calculations; and (viii) the 1995 Uptown Sector Development Plan ("1995 Uptown Plan").[6]  See id. at 2.

Marcotte's first conclusion is that Leon's development plans do not satisfy City of Albuquerque requirements.  Leon's plan, Marcotte states, contains insufficient detail for City of Albuquerque approval.  See Marcotte Report at 4.  Marcotte also asserts that Leon's proposal violates the "10% Rule" of the 1995 Uptown Plan.  Id.  "The 10% Rule requires that any new space developed . . . is restricted to only 10% for retail and commercial uses."  Id.  Marcotte concludes that Leon's plans  contain an excessive amount of retail and commercial space.  See id.  Marcotte further concludes that Leon's plans are not compliant with the 1995 Uptown Plan's requirements for parking, open space, and plazas.  See id.  Marcotte notes further deficiencies in Leon's plans, such as a failure to comply with truck-loading area requirements, landscaping requirements, and view-preservation requirements.  Finally, Marcotte concludes that the phasing plan Leon had developed would not allow him to obtain building permits within a two-year period, as required.  See id. at 5. Based on all these reasons, Marcotte concludes that the City of Albuquerque would not approve Leon's development plans for the Winrock Center.

---

[6] The 1995 Uptown Plan is the City of Albuquerque development plan that sets out the rules that development in uptown Albuquerque, which includes the Winrock Center, must follow.

Marcotte's second conclusion is that Larry Frank and Charlie Miller, the primary representatives of PruWinrock LLC -- the previous owner of the Winrock Center -- would have readily determined that Leon's plans could not be approved, would have considered them of no value, and would not be inclined to sell to Leon on that basis.  See id.  Her third conclusion is that, largely because of the reasons underlying her first conclusion, Leon's plans would not have been useful for development purposes.  Marcotte states that they could not form the basis of pro forma or site plans, and, even if they were sufficiently detailed, they would still be unrealistic and contain numerous violations of the 1995 Uptown Plan.  See id. at 5-6.

Marcotte's fourth conclusion is that Leon was a consultant to Kelly and Goodman, and was not a partner.  Marcotte states that, during a January 18, 2007 meeting, Kelly and Goodman gave Leon tasks to perform, but not each other.  See id. at 6.  She notes that Goodman appeared in control of the meeting and told Leon to be quiet.  See id.  Marcotte also notes that Leon "was not as knowledgeable as he was trying to appear on the planning requirements for the site," id., and that Miller talked with Marcotte about Kelly and Goodman buying the Winrock Center, but never mentioned Leon, see id.  Finally, Marcotte gives her fifth conclusion.  She states that, as a professional planner, she sees no value in Leon's development plans, would not recommend them to any of her clients, and that her current work on the Winrock Center site for Kelly and Goodman is not based on Leon's development sketch.  See id. at 7.

**5.    Motion to Exclude Marcotte.**

As with Burrage, Leon contends that Marcotte's opinions are not based on sufficient data, because she relied on only a limited amount of material that the Defendants' attorneys provided. In particular, Leon challenges Marcotte's first three opinions, which relate to whether the development plans in the presentation binder comply with the 1995 Uptown Plan.  Leon maintains

that, if Marcotte had reviewed the entire presentation binder, she would have known that the development strategy took into consideration the fact that the 1995 Uptown Plan was being rewritten and also that the revised plan might not be approved.  See Marcotte Motion at 2.

Leon also argues that Marcotte's fourth opinion "has no relationship whatsoever to any qualifications Ms. Marcotte might have." Id. at 3.  Leon asserts that Marcotte's observations, based on a single meeting, that Leon appeared to be a consultant to Goodman and Kelly, not a partner, are not the proper subject of Marcotte's expert testimony.  See id.  Finally, Leon contends that Marcotte's fifth opinion, that the development sketch in the binder would not be useful because the City of Albuquerque would not approve it, should be excluded.  Leon maintains that there is no evidence that the sketch -- a single page in a binder of 250 pages -- was intended for use in seeking city approval.  See id.  Moreover, Leon contends that copies of the binder, which included the pro forma and sketches, "were sent to numerous lenders and a number expressed interest in the development concept and wanted to invest." Id.

The Defendants argue that Marcotte is an expert in land-use planning, whose expertise is important to whether the Defendants used Leon's materials and whether those materials were important.  See Response to Motion to Exclude Testimony of Karen Marcotte at 2-3, filed November 26, 2008 (Doc. 67)("Marcotte Response").  The Defendants contend that Leon is incorrect in asserting that Marcotte reviewed only a portion of the presentation binder.  The Defendants maintain that Marcotte testified at her deposition that she reviewed the entire binder and declared that nothing in the binder would affect her opinions.  See id. at 5.  The Defendants argue that, although the binder acknowledges that a new sector plan for uptown Albuquerque is under consideration, the binder does not contain any alternate plan "which would allow [Leon's] concept to be built." Id.  The Defendants also maintain that Marcotte's testimony will be helpful to the jury

-13-

because the materials Leon prepared are of a technical nature.  See id. at 6.

      **6.**      **Daubert <u>Hearing on Marcotte</u>.**

      At the hearing, Mr. Grisham stated that Marcotte, like Burrage, relied on insufficient evidence, but that Leon was also contending that many of Marcotte's opinions were irrelevant.  Mr. Grisham noted that the presentation binder addressed the development concept not being workable under the 1995 Uptown Plan.  <u>See</u> I Tr. at 160:7-161:17 (Grisham).  The plan, Mr. Grisham contended, was to be used for soliciting investors.  <u>See</u> <u>id.</u> at 161:17-21.  Mr. Grisham also argued that Marcotte should not be allowed to give either an expert or a lay opinion about Leon's role, but should be permitted to give only her factual observations of the meeting she attended with Leon, Goodman, and Kelly.  <u>See</u> <u>id.</u> at 163:12-23.

      Marcotte testified that professional land planners work on a variety of issues involving the development of land.  <u>See</u> <u>id.</u> at 168:21-25 (Mendenhall & Marcotte).  Marcotte explained that sector plans are government-created plans that cover a defined geographic area, and set out rules and regulations governing development within the area's boundaries.  <u>See</u> <u>id.</u> at 170:24-171:9.  When a development project is submitted to the City of Albuquerque, the project's plan must be consistent with the relevant sector plan.  <u>See</u> <u>id.</u> at 173:14-19.  Marcotte stated that the 1995 Uptown Plan remains the sector plan that would govern development of the Winrock Center, although a new plan has been undergoing revision for the last two years.  <u>See</u> <u>id.</u> at 173:7-11, 173:20-25.  According to Marcotte, sector plans generally must be followed.  Unlike zoning exceptions, Marcotte stated, an exception to a sector plan requires the City Council to vote for an amendment, and the City Council is reluctant to allow piecemeal amendments to sector plans.  <u>See</u> <u>id.</u> at 177:1-15 (Mendenhall & Marcotte).

      Marcotte testified that she believed she had all the materials she needed to render her

opinions.  See id. at 175:19-21.  She stated that, as a land planner, she was primarily concerned with the development sketch, phasing diagram, and information about planning issues from the pro forma, all of which she had.  See id. at 175:21-176:3 (Marcotte).

Marcotte testified that she was unaware Kelly and Goodman had approved the development sketch before it was put into the presentation binder, but that she considered that approval irrelevant because it was City of Albuquerque approval that was important.  See id. at 191:22-192:9 (Lawless & Marcotte).  Marcotte also testified that she had not reviewed the whole presentation binder before preparing her report and had only glanced through the binder afterwards, because its contents largely had to deal with issues other than land planning.  See id. at 193:18-194:12.  Marcotte stated, however, that, when she looked through the binder, she noticed that the binder mentioned that a new sector plan was being drafted, but that she considered that comment wishful thinking, because the discussion assumed that the planning process would be influenced to create a sector plan allowing for the binder's plan to be used, and that it was uncertain what the new plan would be and when it would take effect.  See id. at 194:13-196:22.

Marcotte admitted that, although she had discussed the issue during her deposition, her expert report did not discuss amendments to sector plans or discuss that the City of Albuquerque was unlikely to entertain such amendments.  See Transcript of Hearing at 4:18-6:20 (taken December 3, 2008)("II Tr.").  Marcotte also said that she could not state that Leon's development sketch had no value for financing purposes or for marketing purposes, because such a conclusion would be beyond her expertise.  See id. at 10:11-15, 10:20-25.

**7.    Silverman's Rule 26 Expert Report.**

Silverman was retained to give his opinion on Leon's pro forma, as well as on "common commercial real estate practices in the New Mexico market."  Exhibit 1 to Silverman Motion at 1

(Docs. 65-2 to 65-3)("Silverman Report").  Silverman's first three points relate to the detail of Leon's pro forma.  Silverman notes that he reviewed two sets of pro forma, one covering the northern 44.75 acres of the Winrock Center site and another covering the entire 81.37 acres.  See id.  Silverman concludes that both are "very summary in nature with neither being supported by a list of key assumptions, any reference to market data . . . or any detail that acknowledges the governmental requirements for developing real estate in Albuquerque."  Id.  Silverman explains that a pro forma is a budget, which a developer would use "to quantify a concept or a plan into an economic model."  Id.  According to Silverman, the value of pro forma lies in the confidence that can be placed in their results.  Accordingly, developers want detailed lists of assumptions, annotated to list the sources.  Silverman concludes that Leon's pro forma lack these key features that would make them useful to a developer, see id., or for presentation to a lender, see id. at 2.

Silverman next concludes that Leon's market-center analysis "was an academic and moot exercise by the time it was prepared."  Id.  Silverman explains that "every good retail plan is predicated on specific anchors and where they are placed on the site."  Id.  Silverman asserts that Target was the key anchor store for Leon's plan, but that Target had secured a location in the Coronado Center.  Leon's failure to account for this fact, Silverman states, makes his plan a flawed one.  See id.

Silverman's fifth point is that the pro forma "for the 44 acre scheme is fatally flawed," because it is not "tied to a market demand plan."  Id.  According to Silverman, Leon's pro forma assumes that he could sell three hundred condominiums in three years at a price of $350.00 per square foot.  Silverman asserts that Leon's assumption is unrealistic and not supported by market data, given that most condominiums in Albuquerque sell for under $250.00 per square foot, with the highest price a condominium recently fetched being $276.00 per square foot.  See id. at 2-3.

Silverman also concludes that Leon's plan proposes only 2,000 parking spaces when at least 6,000 are needed.  See id. at 3.  Silverman calculates that these two problems, if factored in to the pro forma, would result in a cash-flow deficit of over $105 million, making the plan economically unviable.  See id.

Silverman's sixth point is that Leon's plan for the southern thirty-seven acres of the Winrock site is untenable.  Silverman concludes that the amount of office space Leon proposes is unrealistic and that the lease rates which would be required to make them profitable, even if all the space could be leased, would be seventy-five percent above the market average.  See id. at 3-4.  Silverman contends Leon's projected lease rates have no justification in the market.  Silverman's seventh and final point is that Leon's work product was not useful, that he "demonstrated no contribution of any value to the project," and that he "should have known that common practice in New Mexico is for all agreements regarding real estate to be expressed in writing or they are otherwise simple conversation."  Id. at 4.

### 8.    **Motion to Exclude Silverman.**

Leon initially asserts that it is difficult to evaluate Silverman's expertise because of a lack of sufficient information.  Leon maintains that Silverman's opinions relate to the pro forma which Leon prepared, but that Silverman failed to provide the pro forma that Silverman had prepared so that  Leon could evaluate Silverman's expertise.  See Silverman Motion at 2.  Leon also challenges that Silverman's testimony, like Burrage and Marcotte's testimony, is unreliable, because it rests upon a small amount of material that the Defendants' counsel handpicked.  See id. at 2-3.  Leon further contends that, like Burrage, Silverman has opined that Leon's "pro formas are wrong, but he does not do any calculations or offer any opinions as to what is right."  Id. at 2.  Leon then turns to Silverman's individual opinions.

Leon argues that Silverman's first opinion does not state a conclusion.  <u>See</u> <u>id.</u> at 3. Silverman's second opinion, Leon maintains, states that Leon's pro forma are summary in nature and unsupported by key assumptions.  This opinion, Leon contends, "fails to appreciate that the pro formas were prepared for and placed into presentation binders for presentation to potential investors as to the scope and concept of development in the matter."  <u>Id.</u> at 3-4.  Leon further contends that these binders "exceed two hundred and fifty pages and contain much of the background material upon which the pro forma is predicated."  <u>Id.</u> at 4.

Leon next argues that Silverman's third opinion, that Leon's pro forma are insufficient for presentation to lenders, is inadmissible.  Leon contends that this opinion is not based on market research, and that it is undisputed that the pro forma were part of the presentation binders that attracted interest from several lenders.  <u>See</u> <u>id.</u> at 4.  Leon then challenges Silverman's fourth opinion, that the market center analysis was a moot exercise because it relied on Target as an anchor store.  Leon contends that whether Target was considered as an anchor tenant for the project is speculation, because Target is not mentioned in the presentation binder.  <u>See</u> <u>id.</u>

Leon then challenges Silverman's opinion on the lack of pro forma regarding office space. Leon construes Silverman's testimony to be based on Leon not providing justification for the leasing rates he was assuming.  <u>See</u> <u>id.</u> at 4.  Leon argues that Silverman "provides no opinion that such justification in an investor presentation binder is necessary."  <u>Id.</u>  Finally, Leon argues that Silverman's final opinion "is not a real opinion, but more of a discussion of why Silverman does not like Rick Leon."  <u>Id.</u>  Leon argues that Silverman's comments are irrelevant, speculative, and ultimately end in "a legal opinion that in New Mexico all agreements regarding real estate need to be in writing."  <u>Id.</u> at 5.

The Defendants counter that Silverman is experienced in "assessing pro formas as a

commercial real estate developer in New Mexico, Texas and Asia for more than 30 years, and has particular knowledge of the Uptown market." Response to Motion to Exclude Testimony of Paul Silverman at 4, filed November 26, 2008 (Doc. 69)("Silverman Response"). The Defendants argue that Leon's challenge to Silverman's reliability is misleading. The Defendants contend that they provided Silverman with more materials than Leon recites and that Silverman has reviewed the entire presentation binder, as well as independently obtained material. See id. at 5.

The Defendants argue that Silverman's opinion is reliable. They contend that he relied upon relevant materials from the case, as well as a Grubb & Ellis historical data report and residential condominium listings. See id. at 6. The Defendants then argue that a Daubert challenge should be to the qualifications and reliability of expert opinions, and not to the content of those opinions. See Silverman Response at 6. The Defendants close by arguing that Silverman's testimony will assist jurors in interpreting the pro forma. See id.

**9.    Daubert Hearing on Silverman.**

Mr. Grisham noted that Leon's challenge to Silverman's testimony was somewhat different from the challenges to Burrage and Marcotte. Mr. Grisham stated that it was harder to gauge Silverman's credentials and qualifications because he had less of a track record as an expert witness and also had failed to bring to his deposition as requested, pro forma he had prepared. See II Tr. at 36:12-37:2 (Grisham). Leon had not sought to compel production, Mr. Grisham said, because the depositions were conducted recently and there was barely time to brief the Daubert issues. See id. at 37:3-16 (Court & Grisham). Because of that short time frame, Mr. Grisham said, Leon had not pursued any discovery motions on Silverman's failure to produce pro forma. See id. at 37:14-16 (Grisham).

Silverman testified that he was a real estate developer, working primarily in commercial real

estate, and had been since 1975. See id. at 39:4-16 (Mendenhall & Silverman). As part of the development process, Silverman would secure financing for the projects on which he worked. See id. at 39:17-21. In particular, Silverman testified that he was familiar with pro forma, which formed a central part of his job. See id. at 44:18-45:2. Silverman stated that he prepared pro forma for his projects, which were confidential, and had also reviewed pro forma others had prepared as part of his work in the National Association of Industrial and Office Property ("NAIOP"). See id. at 48:6-49:12.

According to Silverman, he had received all the information he needed for his opinions. See id. at 49:17-19. Silverman reviewed a number of documents, including Leon's pro forma, the development sketch, phasing plan, presentation binder, Burrage's and Marcotte's expert reports, and several other documents the Defendants' counsel provided, as well as independently reviewing Grubb & Ellis market analyses, a Multiple Listing Service report on residential condominium sales, and other market data. See II Tr. at 49:23-51:15. Silverman concluded from his reviews that Leon's pro forma lacked annotation and support, and that the presentation binder did not cure this defect because the binder lacked third-party material on which the pro forma could rely. See id. at 54:3-55:12. Silverman did not, however, review the presentation binder until after he had completed his expert report. See id. at 97:21-98:4 (Lawless & Silverman).

Silverman testified that the market-center plan was flawed, because it relied on Target as an anchor store. Silverman stated that, despite the lack of Target being named, he knew Target was the intended anchor based on common knowledge in the market and based on the "footprint" or layout, which he could identify from experience as being a Target store. Id. at 59:10-60:17. Silverman testified that, at the time Leon prepared the pro forma, Target had already acquired space at the Coronado Center. See id. at 60:18-61:19.

## STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY

At least since the Supreme Court decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), trial courts have had the responsibility to ensure that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide. The trial court must not only decide whether the expert is qualified to testify, but whether the opinion testimony is the product of a reliable methodology. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> requires the Court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound.

### 1.    Rule 702.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Thus, rule 702 requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." <u>LifeWise Master Funding v. Telebank</u>, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. <u>See</u> <u>Morales v. E.D. Etnyre & Co.</u>, 382 F.Supp.2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing <u>Bourjaily v.</u>

United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). The Court should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

### 2.      Qualifications of an Expert.

A person must be qualified to testify as an expert.  Expert qualifications are not limited to formal training, but includes "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  The testimony that an expert witness gives must be within the scope of his or her expertise. In Eagleston v. Guide, 41 F.3d 865 (2d Cir. 1994), the United States Court of Appeals for the Second Circuit affirmed the district court's exclusion of expert testimony on the grounds that the plaintiff's proffered expert was not qualified to give the particular opinions about which he proposed to testify.  The plaintiff in Eagleston v. Guide had retained a sociologist who was going to testify about Suffolk County's arrest and mediation practices in situations of domestic violence, and what changes should be made to them.  See id., 41 F.3d at 874.  The district court excluded the sociologist.  The Second Circuit upheld the exclusion, noting that "the plaintiff failed to establish that [the sociologist] was an expert in either criminology or domestic violence," and that the district judge "acted within the bounds of his discretion in concluding that someone unfamiliar with arrest

practices in New York was unqualified to testify about them." Id.

3.      The Daubert Standard.

In its role as gatekeeper, the Court must assess the reasoning and methodology underlying an expert's opinion and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 594-95.  While Daubert v. Merrell Dow Pharmaceuticals, Inc. dealt with scientific testimony, in Kumho Tire v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the reach of Daubert v. Merrell Dow Pharmaceuticals, Inc. and applied the standard to all expert testimony.  See Kumho Tire v. Carmichael, 526 U.S. at 149.  A court must scrutinize any proffered expert testimony to determine whether it is the product of sound reasoning and methodology.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court listed a variety of potential factors that could bear on the admissibility of expert testimony:

-Whether a "theory or technique ... can be (and has been) tested";

-Whether it "has been subjected to peer review and publication";

-Whether, in respect to a particular technique, there is a high "known or potential rate of error," and whether there are "standards controlling the technique's operation"; and

-Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

Kumho Tire v. Carmichael, 526 U.S. at 149-50 (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 592-94)(Daubert v. Merrell Dow Pharmaceuticals, Inc., internal quotation marks removed).

The Supreme Court made it clear, however, that the criteria laid out in Daubert v. Merrell

Dow Pharmaceuticals, Inc. was not a mandatory or exhaustive checklist, and did not necessarily

apply to all forms of expert testimony:

> In other cases, the relevant reliability concerns may focus upon personal knowledge
> or experience. . . . Our emphasis on the word "may" thus reflects *Daubert's*
> description of the Rule 702 inquiry as "a flexible one." [Daubert v. Merrell Dow
> Pharmaceuticals, Inc.,] 509 U.S., at 594, 113 S.Ct. 2786. *Daubert* makes clear that
> the factors it mentions do not constitute a "definitive checklist or test." Id., at 593,
> 113 S.Ct. 2786. And *Daubert* adds that the gatekeeping inquiry must be "'tied to the
> facts'" of a particular "case." Id., at 591, 113 S.Ct. 2786 (quoting United States v.
> Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). . . . "[The] factors identified in
> *Daubert* may or may not be pertinent in assessing reliability, depending on the nature
> of the issue, the expert's particular expertise, and the subject of his testimony." . . .
> The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases
> and for all time the applicability of the factors mentioned in *Daubert*, nor can we
> now do so for subsets of cases categorized by category of expert or by kind of
> evidence. Too much depends upon the particular circumstances of the particular case
> at issue.

Kumho Tire v. Carmichael, 526 U.S. at 150.  Ultimately, where expert "testimony's factual basis,

data, principles, methods, or their application are called sufficiently into question . . . the trial judge

must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the

relevant] discipline.'" Id. at 149 (quoting Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. at

592)(brackets added by Kumho Tire v. Carmichael).

**4.     The Expert's Use of Selective Materials.**

In Miller v. Pfizer, Inc., 356 F.3d 1326 (10th Cir. 2004), the Tenth Circuit affirmed a district

court's exclusion of expert testimony where the district court had excluded testimony partially on

the grounds that the expert relied on pre-selected evidence.  In Miller v. Pfizer, Inc., the plaintiffs

were parents whose son had committed suicide shortly after he began taking Zoloft.  The parents

filed a wrongful-death action and retained Dr. Healy as an expert witness to give his opinion

whether Zoloft caused their son Matthew's suicide.  The Tenth Circuit noted:

Concerned, however, about "Dr. Healy's reliance on pre-selected evidence from

-24-

> interested parties, to the exclusion of reliable evidence that Matthew engaged in suicidal thoughts and behavior before he first used Zoloft," the [district] court had "asked its independent experts whether selective reliance was consistent with generally accepted methodology on the issue."  [Miller v. Pfizer, 196 F.Supp.2d 1062 at 1086 (D.Kan.2002)].  The independent experts informed the court that such selective reliance was not a generally accepted methodology.

Miller v. Pfizer, Inc., 356 F.3d at 1331.  The Tenth Circuit did not analyze this issue in its ruling.

The Tenth Circuit, however, found that the district court, overall, did not abuse its discretion, but

"carefully and properly performed its gatekeeping function under *Daubert*."  Miller v. Pfizer, Inc.,

356 F.3d at 1335.

**5.      Testing Testimony.**

In the case of Crowley v. Chait, 322 F.Supp.2d 530 (D.N.J. 2004), the United States District

Court for the District of New Jersey excluded expert testimony on the grounds that the expert was

"testing testimony."  The district court stated:

> [T]here is something dubious about hiring an expert to "test testimony."  Lawyers test testimony.  Experts should conduct independent analyses, which ultimately may or may not confirm what various deponents have said. . . .  The information upon which any expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which in addition to Rule 702, must be considered by a court for *Daubert* purposes.

Crowley v. Chait, 322 F.Supp.2d at 542.

## ANALYSIS

Leon makes a wide variety of challenges to the admissibility of the Defendants' experts'

testimony.  The majority of these challenges fail, however, because they are more appropriately

directed at the weight that the jury should give the experts' opinions and do not demonstrate that the

experts' testimony is methodologically flawed. Some of his challenges hit the mark, however,

particularly regarding several opinions that assert legal conclusions or factual observations that

should not be the subject of expert testimony here.

I.      **THE COURT WILL ALLOW BURRAGE TO OFFER MOST OF HIS OPINIONS AT TRIAL.**

Leon raises four arguments that Burrage's testimony, or portions of it, should not be permitted at trial: (i) that some of Burrage's opinions are not within his expertise; (ii) that Burrage did not rely on sufficient data; (iii) that Burrage did not employ a sound methodology; and (iv) that one of Burrage's opinions contains legal conclusions.  Only Leon's final argument ultimately presents grounds to exclude some of Burrage's testimony.  The Court will not permit Burrage to place his expertise behind any conclusions that are properly legal conclusions for the jury to reach after applying the law to the facts of the case, but will otherwise allow Burrage to testify to the opinions expressed in his report.

A.      **BURRAGE'S OPINIONS ARE WITHIN HIS EXPERTISE AS A FORENSIC ACCOUNTANT.**

Leon does not challenge Burrage's qualifications for his professed expertise in forensic accounting.  Leon argues, however, that three of Burrage's opinions are not encompassed within this expertise: (i) his opinion regarding the collapse of the subprime mortgages market, leading to credit and equity financing being harder to obtain; (ii) his opinion about rising construction costs; and (iii) his opinion on lease rates.  All three opinions, however, are properly within Burrage's field of expertise.

First, Burrage is qualified to discuss the ripple effect the troubles in the subprime mortgage market has had on the broader debt and equity financing markets.  It is important to note that Burrage is not extrapolating from the subprime collapse to a complex and multifaceted picture of economic trends.  Burrage's opinion is much more modest, noting that the effects of the crisis in the subprime market would restrict financing and lead to delays in Leon's expected time-line.  See Burrage Report at 3-4.  Burrage is also not without economics expertise.  He testified that he had

experience in evaluating the effects economic factors would have on a business' profitability and that such evaluations were within the field of forensic accounting.  See I Tr. at 49:23-50:15 (Eaves & Burrage).

Forensic accountants are specialists in the financial and accounting angles to valuing businesses and calculating lost profits.  Given the nature of the work, it is reasonable for forensic accountants like Burrage to rely on and use basic economic data in their investigations of businesses and profits.  Burrage's opinion does not attempt to precisely quantify the effect of the tremors in the market that the subprime fallout caused, nor does it attempt to independently determine the precise ramifications of the market collapse.  Burrage's opinion takes basic economic data and applies it to his field of expertise.  The AICPA manual on calculating lost profits states that an expert accountant analyzing the damages of a newly established business, the closest analog to Leon's hypothetical business, should consider assessing the "economy in which the business operates."  Calculating Lost Profits at 51.  The Court does not see anything wrong, on the level of admissibility, with Burrage, relying on economic data, making the relatively straightforward opinion that he makes.

Second, Burrage properly concluded that construction costs were rising and that this increase in costs would impact the profitability of the Winrock project as Leon envisioned it.  While it is true that Burrage is not a construction contractor, he is a business valuation expert and forensic accountant, professions that involve ascertaining costs and income.  Burrage relied upon data from a reliable source, the U.S. Geological Survey, and Leon has not contested the reliability of this source.  Moreover, Burrage's discussion of rising construction costs does not involve an intensive analysis of the construction industry or of contracting.  Rather, Burrage took fairly straightforward, objective data on rising costs and discussed how those rising costs would impact the value of a business prospect, which is within his core area of expertise.  Leon's contention, ultimately, boils

down to the idea that a forensic accountant is not qualified to testify on any calculation of profits or business valuation that touches on some distinct field.  That contention, however, sweeps too broadly and would, followed to its logical conclusion, mean that a forensic accountant could not value any business, except perhaps a consulting firm that does forensic accounting.

At the hearing, although not necessarily contesting the reliability of the U.S. Geological Survey materials Burrage used, Leon questioned their relevance.  Leon notes that Burrage used commodity-price information for Utah.  Burrage testified, however, that, in his experience, the prices of commodities do not appreciably differ from region to region, and that he was moreover looking only for price trends, not specific figures.  See I Tr. at 78:14-80:18 (Lawless & Burrage). Leon remains free to attack these assumptions at trial, but the Court does not believe that they are so methodologically unsound that the Court should exclude Burrage's opinions from trial altogether. Burrage's explanation shows that the practice is reasonable enough to survive a Daubert challenge.

Third, Burrage's opinion that lease rates would not reach the levels Leon assumed for several years is also proper.  Again, Burrage is relying upon data from other reputable sources.  On the basis of that data, he is performing basic financial calculations to predict future profits.  Although Leon points out the Burrage does not know who at Grubb & Ellis wrote the report he uses, the Court does not see how not knowing the identity of the particular person or persons working on a report is relevant.  Burrage's opinion on lease rates is within his expertise.

Leon relies on a case from the Second Circuit for his contention that these three opinions of Burrage's should be excluded, but that case does not lend much support to his argument.  In Eagleston v. Guido, the Second Circuit affirmed the district court's exclusion of a sociologist's testimony. The sociologist was going to testify on behalf of the plaintiff about Suffolk County's arrest and mediation practices in situations of domestic violence and what changes should be made

to them.  See id., 41 F.3d at 874.  The Second Circuit upheld the exclusion, noting that "the plaintiff

failed to establish that [the sociologist] was an expert in either criminology or domestic violence,"

and that the district judge "acted within the bounds of his discretion in concluding that someone

unfamiliar with arrest practices in New York was unqualified to testify about them."  Id.  The

situation here is different.  Sociology is a very broad field, embracing many smaller fields of

specialization, and the expert in Eagleston v. Guido was attempting to base his entire testimony on

conclusions within the distinct areas of criminology and domestic violence.  Here, Burrage is an

expert in the specialized field of forensic accounting, and is basing his opinions in part on data

drawn from areas that touch upon both the field of forensic accounting -- cost assessment -- and the

fields of economics, construction, and real estate -- the sources of the data on the underlying trends.

Moreover, unlike here, the sociologist in Eagleston v. Guido was attempting to testify about specific

practices with which he was unfamiliar.

## B.   BURRAGE'S OPINIONS ARE BASED ON SUFFICIENT FACTS AND DATA.

Leon levels a wholesale challenge at the data upon which Burrage relied in coming to his

conclusions.  Leon asserts that Burrage's reliance on a small sample of evidence that the

Defendants' handpicked renders his testimony inadmissible.  Leon contends that this problem

undermines Burrage's entire testimony, requiring exclusion of all of Burrage's opinions.  See

Burrage Motion at 6.  Leon also makes a similar challenge to the other experts, Marcotte and

Silverman.  While the Court understands Leon's concerns, the Court believes that the materials on

which Burrage relied are appropriate and that, on the facts of this case, Burrage should be allowed

to testify.  In this situation, Leon's arguments go to the weight that the jury should give Burrage's

opinions, but do not indicate that Burrage should be excluded as a witness.

An expert witness' testimony must be "based upon sufficient facts or data." Fed. R. Evid. 702. The data supporting Burrage's opinions pass this test. The Court does not believe that an attorney's selection of material for an expert to review necessarily infects that expert's testimony with unreliability. Lawyers can, of course, cherry-pick from the record and only supply the expert with information favorable to their cause, but they also might present the expert with adequate, unbiased information. Moreover, requiring every expert to undertake an independent evaluation of the entire record to determine what he or she did or did not need to consider could make expert testimony unnecessarily more expensive, and would not further the goal of the "elimination of unjustifiable expense and delay." Fed. R. Evid. 102.

Leon relies primarily on Miller v. Pfizer, Inc., a Tenth Circuit case, and on Crowley v. Chait, a case from the United States District Court for the District of New Jersey, to support his challenge. Crowley v. Chait is not binding on the Court. Moreover, the Court does not necessarily agree with the broad notion that "there is something dubious about hiring an expert to 'test testimony,'" or the idea that only "[l]awyers test testimony." Id., 322 F.Supp.2d at 542. Lawyers are not financial and accounting experts. While it would be inappropriate for an expert to, for instance, given an opinion that another witness is lying or unreliable, the Court sees nothing wrong with an expert attacking the methodology another witness has taken in calculating damages. Burrage is not giving opinions on Leon's credibility, he is giving opinions whether Leon's calculations comply with technical financial standards. To the extent that Crowley v. Chait can be read as holding otherwise, the Court declines to follow that case.

This case also presents a different scenario than in Miller v. Pfizer, Inc. First, the Tenth Circuit did not analyze the selectivity argument in detail; the Tenth Circuit noted only that the district court did as part of its analysis, which the Tenth Circuit affirmed with little discussion.

Furthermore, in <u>Miller v. Pfizer, Inc.</u>, the plaintiffs had retained an expert to analyze whether their son's use of Zoloft led to his suicide. The expert concluded that the drug had caused the death, based upon "pre-selected evidence from interested parties, to the exclusion of reliable evidence that [the son] engaged in suicidal thoughts and behavior before he first used Zoloft." <u>Id.</u>, 336 F.3d at 1331. The expert had been asked to opine upon causation, but had been given only a slanted view of the facts that omitted many key potential causal factors. Burrage's role here is different. Burrage was not retained to give an assessment about causation or some other broad, uncertain aspect of the case. He was retained specifically for the purpose of analyzing a discrete set of documents: Leon's damages calculations. With the limited scope of Burrage's task in mind, the selection that the Defendants' counsel made is reasonable and is not a biased choice of evidence that would require the exclusion of an expert witness.

Moreover, as the Defendants note, Burrage did not rely solely on material they chose. Burrage independently decided to use several other sources in reaching his conclusions, such as commodities-price data and historical data from a commercial-realty firm. <u>See</u> Burrage Report at 2; I Tr. at 75:10-17, 77:4-16 (Lawless & Burrage). Furthermore, Burrage believed that he had been given sufficient material to conduct his analysis in a manner compliant with accounting standards. <u>See</u> I Tr. at 97:6-14, 119:19-127:2 (Lawless & Burrage). Burrage did not think there was any information he needed for his report that he had not received. <u>See id.</u> at 66:3-5 (Eaves & Burrage); <u>id.</u> at 69:21-70:2 (Lawless & Burrage). While Burrage admitted that he did not review the entire presentation binder before writing his report, Burrage considered the full binder and other documents later, concluding that these extra materials did not change his opinions. <u>See id.</u> at 65:6-66:2 (Eaves & Burrage); 119:19-127:2 (Lawless & Burrage). A jury may be skeptical about Burrage's approach, but the Court does not see how Burrage's not seeing the full binder until later

would render his approach unreasonable under rule 702.

While Leon pinpoints several potential weaknesses in Burrage's assertions that he had everything he needed, these arguments ultimately go to the weight of the evidence and do not demonstrate fatal methodological flaws that would require exclusion.  A jury might question Burrage's contention that most of the presentation binder was irrelevant for his purposes, because the binder concerned Kelly and Goodman's plans and not the hypothetical plan and companies Leon devised, see I Tr. at 138:10-139:10 (Eaves & Burrage), but given Burrage's narrow task, his approach does not seem methodologically unsound.  Although Burrage did not consider a construction estimate in his report, it appears that neither Burrage nor the Defendants' counsel were aware such an estimate existed.  See I Tr. at 82:11-83:17 (Lawless & Burrage); id. at 140:13-18 (Eaves & Burrage).

Leon also complains of Burrage's use of the Internet to assist in his research.  See, e.g., id. at 97:22-99:12 (Lawless & Burrage).  Leon seems to be indicating that data taken off the Internet is unreliable.  The Internet, however, in this situation, is a tool for conducting research.  Indeed, thanks to services such as Westlaw, LexisNexis, HeinOnline, and GPOAccess, most legal research today is done on the Internet.  Both reliable and unreliable information can be found on the Internet. The sources Burrage notes in his report, such as U.S. Geological Survey reports, fall into the former category.  Leon also makes a point of the Internet not appearing in the AICPA's guide on litigation services' discussion of sufficient data.  See I Tr. at 97:15-98:10 (Lawless & Burrage).  Books and treatises, however, are also absent from that discussion.  See Litigation Services and Applicable Professional Standards ¶ 24, at 4-5.  Reliable sources pulled from the Internet would fit within the category of factual assumptions upon which an expert may rely.  See id. ¶ 24, at 5.  Ultimately, given Burrage's limited mission of determining the sufficiency of Leon's damages calculations,

Burrage had enough information to render his opinions.

### C.    BURRAGE USED A METHODOLOGY THAT WAS RELIABLE.

Burrage testified that he employed a methodology that meets the standards set out in several publications regarding accounting, business valuation, and lost profits. See 45:12-46:5, 61:14-63:22 (Eaves & Burrage).   The Defendants have not challenged that these guides lay out a reliable methodology.   Although Burrage admitted that he did not review these works immediately before writing his report, Burrage testified that he was familiar with them.   See id. at 88:14-89:24 (Lawless & Burrage); id. at 91:10-21.   The Court does not see how Burrage's failure to re-read such materials wound undermine his methodology.   Many experts, whether they are accountants, doctors, lawyers or otherwise, are familiar with how to properly engage in many aspects of their calling without resort to such materials unless a particularly thorny question arises.

Leon's main argument against Burrage's methodology is that Burrage has not conducted an independent analysis of what Leon's damages might be.   Burrage, however, is not required to perform such a calculation.   Leon's contention that, "without knowing the correct answer, [Burrage] only gives an opinion that Rick Leon's damages calculations are incorrect," misses the point. Burrage Motion at 6.   The Defendants do not need to prove anything; Leon must prove his damages to a reasonable certainty.   Burrage's testimony is aimed at showing that Leon's damage calculations are unreliable.   Burrage and the Defendants do not have to assume that Leon was in fact damaged before they critique Leon's damages calculations.   The Defendants can therefore assail Leon's position without having to show what the correct amount of Leon's damages would be.   Nor has Leon shown how Burrage would need to know the correct answer to be able to point out flaws in Leon's methodology.   At the hearing, Leon questioned whether Burrage had considered certain factors that the AICPA considers relevant to newly established business damages, such as the prior

-33-

experience of the plaintiff.  Again, however, Burrage is simply attacking Leon's calculations on certain points.  Leon's challenge would be more appropriate if Burrage were the one trying to establish the certainty of a particular damages figure.  In any case, Leon can use his criticisms on cross-examination.  Accordingly, Burrage's critique of Leon's calculations is appropriate.

### D.     THE COURT WILL LIMIT BURRAGE'S LEGAL CONCLUSIONS.

Leon argues that the Court should not allow Burrage to offer opinions that amount to legal conclusions, because that is the province of the jury or the Court.  Burrage stating legal conclusions is not, however, alone enough to disqualify his testimony.  Opinion testimony is admissible even if it "embraces an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704(a).  Not all opinions on ultimate issues, however, are admissible.  "[A]n expert may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment."  United States v. Dazey, 403 F.3d 1147, 1171 (10th Cir. 2005).  While Burrage cannot say that Leon's cost estimates should be legally ignored because they are speculative and fail to meet the legal standard of reasonable certainty, Burrage may testify that, based on his expertise, he has concluded that Leon's calculations are speculative and fail to meet accepted accounting standards.  Burrage may also explain that Leon's damages calculations, in his opinion, do not account for mitigation, but may not tell the jury that they must find that Leon failed to mitigate his damages.

### II.    THE COURT WILL NOT EXCLUDE MARCOTTE'S TESTIMONY, BUT WILL REQUIRE HER TO TESTIFY AS A LAY WITNESS ON CERTAIN TOPICS.

As with the other experts, one of Leon's major challenges to Marcotte's testimony is her reliance on materials the Defendants' attorneys chose.  Also like the other experts, the Court believes that this selection process does not undermine Marcotte's testimony to a degree where

exclusion would be necessary. The Court also does not believe that Marcotte's opinions are irrelevant, given the broad claims that Leon makes. Accordingly, the Court will allow Marcotte to offer her opinions at trial, but will require that her conclusions regarding the January 18, 2007 meeting be offered as a lay opinion, rather than an expert opinion.

### A.   MARCOTTE'S OPINIONS ARE BASED ON SUFFICIENT FACTS OR DATA.

Leon's argument that Marcotte's opinions are based on insufficient data that the Defendants' attorneys handpicked is similar to his challenge to Burrage's testimony and fails for similar reasons. Marcotte, like Burrage, was asked to opine about a specific set of documents on a specific issue. In Marcotte's case, she was asked to review Leon's development plans and determine whether they could be approved under the 1995 Uptown Plan. The limited material she considered is reasonable given the limited scope of her engagement.

Specifically, Leon contends that Marcotte should have reviewed pages 864 and 873 through 875 of the presentation binder. These pages, Leon maintains, reveal that the plan took into account that the 1995 Uptown Plan was being rewritten and also that the revised plan might not be put into effect. See Marcotte Motion at 2. Marcotte, however, reviewed the binder, although not until after preparing her report. She testified that the binder's taking these issues into account, however, was in her view wishful thinking and did not impact her opinion that the plan did not comply with the 1995 Uptown Plan. See I Tr. at 193:18-196:22 (Lawless & Marcotte). Leon's arguments go to the weight of Marcotte's testimony, not to its reliability or admissibility. Neither section of the binder that Leon contends is important to Marcotte's conclusions has any impact on whether Leon's plans complied with the 1995 Uptown Plan -- those sections deal with whether a different sector plan might ultimately come into effect. This uncertainty about what the governing City plan would

ultimately be, and the extent to which this uncertainty was taken into account, are factors that bear on whether Leon's plan's compliance or lack of compliance with the 1995 Uptown Plan is significant. These considerations, however, do not undermine Marcotte's conclusions about the discrete issue of the plan's compliance with a particular sector plan.

To the extent that Leon's challenge goes to Marcotte's opinion that the development plan and sketch lacked value, the challenge also goes more to the weight of the evidence. Marcotte admitted that she could not conclude that Leon's work was without value from a marketing or financial standpoint. See II Tr. at 10:11-15, 10:20-25 (Lawless & Marcotte). She could, however, reach a conclusion that the plan lacked value from an development-plan approval perspective.

## B.   MARCOTTE MUST TESTIFY AS A FACT WITNESS ON HER FOURTH CONCLUSION.

Marcotte's fourth conclusion is that Leon's role with Kelly and Goodman was as consultant, and not as a partner in the deal to acquire and to develop the Winrock Center. See Marcotte Report at 6. Leon contends that this conclusion may be something that could be argued to the jury, but that it falls outside of Marcotte's expertise. The Court agrees. Marcotte may not testify as a rule 702 expert to her fourth conclusion. Marcotte may, however, testify as a fact witness to the events on which she based her conclusion that Leon was a consultant and not a partner. As stated at the hearing, the Court will leave it up to the parties to devise an acceptable way of separating Marcotte's two roles. If the parties are unable to reach an agreement, the Court will, with the parties' input, impose its own requirements.

Expert testimony is needed where "the subject matter of [the] proffered testimony constitutes scientific, technical, or other specialized knowledge." LifeWise Master Funding v. Telebank, 374 F.3d at 929 (internal quotation marks omitted). By contrast, lay opinions are those that "do not

require any specialized knowledge and could be reached by any ordinary person." Id. (internal quotation marks omitted). Marcotte's conclusions fall into the latter category. While Marcotte's experience in dealing specifically with developers and consultants on many occasions may give her somewhat finer antennae for picking up social cues when dealing with such individuals, the Court does not believe that her experience is materially different from that of the average person. A secretary or courier could observe how people in an office treat each other and reach a similar conclusion. Most people are familiar with social dynamics and hierarchy in the workplace; Marcotte's conclusions do not touch upon an area where specialized knowledge or expertise is needed.

Marcotte's conclusions were based on her observations at a January 18, 2007 meeting and including a number of observations: (i) Kelly and Goodman treated Leon differently than they treated each other; (ii) Kelly and Goodman gave Leon assignments to complete, but did not give each other assignments; and (iii) Mr. Goodman cut Leon off during the meeting and seemed to be in control. See Marcotte Report at 6. Marcotte also based her conclusion on Leon's absence from future meetings, what she considered Leon's lack of knowledge about planning requirements, and Charlie Miller of PruWinrock, LLC's questions about Kelly and Goodman as potential buyers of the Winrock Center without mentioning Leon. See id. at 6-7. These underlying facts are all observations that a layperson might make, and a layperson also might reasonably draw from these facts the conclusion that Kelly and Goodman treated each other equally, but did not treat Leon at their level. No specialized knowledge is needed to reach this result.

While Leon admits that Marcotte may testify about the events she observed, Leon contends that Marcotte should not be allowed to offer a lay opinion. See I Tr. at 163:12-23 (Grisham). Marcotte's lay opinion would be admissible, however, if it was "helpful to a clear understanding of

[her] testimony or the determination of a fact in issue." Fed. R. Evid. 701(b). Human interactions are an area where the subtleties are difficult to articulate. While Marcotte, in her testimony and her report, has been able to describe certain particular events that support her conclusion, the Court believes it would be helpful to the jury to allow Marcotte to testify that her overall impression of the January 18, 2007 meeting was that Goodman and Kelly were not treating Leon as an equal.

### C.   MARCOTTE MAY TESTIFY ABOUT THE USEFULNESS OF LEON'S DEVELOPMENT PLANS AND SKETCH.

Although it is not clear from his motion, at the hearing, Leon stated that one of his primary challenges is that Marcotte's testimony is not relevant under rule 402. See I Tr. at 160:7-12 (Grisham). Leon contends that his development plan and sketches were not intended for approval through the City of Albuquerque's approval process. It is not clear, however, that Leon's broad allegations in his Complaint are limited to assertions that Leon's development plan and sketch were only for the purposes of marketing and attracting investment. See, e.g. Complaint for Bad Faith and Fraud ¶ 31, at 5, filed May 11, 2007 (Doc. 1)("The actions of the Defendants constituted intentional and/or negligent misrepresentations of Defendants' intent to join in partnership with Plaintiff in an attempt to use materials written and developed by Plaintiff and acquire the Winrock Center property for themselves and exclude Plaintiff from all property and all profits to be derived therein."). Moreover, Leon remains free at trial to present evidence on the factual issue whether the development plan and sketch were ever intended for City of Albuquerque approval.

### III.   THE COURT WILL ALLOW SILVERMAN TO TESTIFY ABOUT MOST OF HIS OPINIONS.

Leon's challenges to Silverman are similar to those against the other experts. Accordingly, for similar reasons, most of Silverman's testimony is admissible under Daubert. While Leon contends that Silverman's qualifications are less clear than those of the other experts, the Court

concludes that Silverman has the requisite experience and knowledge to give the opinions he does, and that some of Leon's arguments relate to discovery matters, not to admissibility matters.  The Court will, however, restrict Silverman's ability to offer testimony on his final conclusion, which includes speculation about possibilities, and will also require him to testify as a fact witness in part.

### A.     SILVERMAN IS QUALIFIED TO OFFER HIS OPINIONS.

Leon does not advance any specific argument that Silverman is unqualified, but rather contends that Silverman's lack of a history as an expert witness, and his failure to provide requested pro forma, make it difficult to evaluate his qualifications.  See Silverman Motion at 1-2.  Based upon on his testimony and his resume, however, Silverman has extensive experience in real estate development.  Silverman has been involved in developing thirty-six projects over the course of over thirty years, is a past president of the local chapter of the NAIOP, and remains a licensed real estate broker and general contractor.  See II Tr. at 39:11-44:17 (Mendenhall & Silverman); Exhibit 3 to Silverman Response, Paul L. Silverman's Resume (Doc. 69-4).  Silverman testified that he is familiar with, and has prepared, reviewed, or critiqued, many pro forma.  See II Tr. at 44:18-45:2, 48:6-49:12 (Mendenhall & Silverman).  As the Court stated at the hearing, Silverman's failure to provide pro forma to Leon is a discovery issue and will not preclude him being qualified as an expert or testifying as an expert.  See id. at 73:21-74:9 (Lawless & Court).  If Leon wanted to secure Silverman's pro forma, Leon should have moved to compel, but this discrete issue does not preclude Silverman from testifying.  At most, the additional documents would have provided additional cross-examination material.  Accordingly, Silverman is qualified by experience and knowledge to give expert testimony on real estate development, and upon the use and preparation of pro forma in the real estate development industry.  See Fed. R. Evid. 702.

**B.  SILVERMAN'S OPINIONS ARE BASED ON SUFFICIENT FACTS OR DATA.**

As in the case of Burrage and Marcotte's opinions, Leon contends that Silverman has an insufficient foundation for his testimony.  Also like Burrage and Marcotte's opinions, the Court concludes that Silverman has a sufficient basis for his opinions.  Like his fellow experts in this case, Silverman was asked to comment on a particular set of documents -- in Silverman's case, Leon's pro forma.  Silverman testified that he believed he had the documents he needed to perform his analysis.  See II Tr. at 49:17-19 (Mendenhall & Silverman).  As with the other experts, the Court does not see counsel's choice of documents to provide Silverman rising to the level of biased selectivity that would require the Court to exclude Silverman's testimony.

The main omission to which Leon points is, similar to the other experts, Silverman's failure to review the entire presentation binder before writing his report.  Leon emphasizes that the presentation binder arguably provides the supporting data and details that Silverman concluded was lacking in Leon's pro forma.  Silverman, however, maintained that he did not view the remainder of the binder as salvaging the pro forma, because the binder did not have third-party information.  See id. at 54:3-55:12.  Silverman's explanation is a reasonable one.  While his not reviewing the binder before reaching his conclusions leaves him open to attack in front of the jury, this oversight, given his testimony, is not a flaw that requires exclusion.

Another particular attack that Leon makes, which might be considered as a challenge to the sufficiency of Silverman's information, is Leon's argument that the Court should exclude Silverman's opinion that the market-center analysis was a moot exercise because it relies solely on speculation.  Silverman concluded that the analysis was moot, because it relied on Target as an anchor store, and Target had already secured space in the Coronado Center and the only other

-40-

candidate for anchoring the plan, Wal-Mart, had also secured space elsewhere.  See id. at 60:18-61:19.  This conclusion, Leon argues, is speculation, because Target is not mentioned anywhere in the analysis or in the rest of the 250-page binder.  See Silverman Motion at 4.  Silverman testified, however, that, based on his experience, he could tell that Target was the anticipated anchor based on the "footprint" on the plan -- the shape and size of the outline on the sketch -- which to an experienced developer indicates that Target was the intended store just as clearly as the actual name Target on the page would.  II Tr. at 59:10-60:17 (Mendenhall & Silverman).  This testimony is sufficient to establish that Silverman's opinion is based not on speculation, but on his experience.

### C.  MOST OF SILVERMAN'S OPINIONS ARE ADMISSIBLE.

In addition to Leon's challenges to Silverman's qualifications and to his underlying data, Silverman makes a handful of other attacks on particular opinions.  Leon contends that Silverman's third opinion, that Leon's pro forma were too summary for presentation to a lender, is not based on any market research or contact with lenders, and is belied by the pro forma being used in the presentation binder that successfully elicited interest from a number of lenders.  See Silverman Motion at 4.  Given Silverman's experience with using pro forma to secure financing, the Court does not see that Silverman's general conclusion that the pro forma fail to meet expected standards for presentation to a lender would be inadmissible.  Silverman cannot, of course, opine whether the pro forma would be acceptable to a particular lender without more of a foundation, but he can express a general statement.  Leon remains free to challenge Silverman's conclusion with particular examples.

Such a challenge is what Leon's second line of attack entails.  That challenge, however, is more suitable for cross-examination at trial.  As Leon notes, his pro forma were part of the presentation binders that drew some investor interest.  Leon does not, however, argue that it was his

pro forma alone, among the many other pages in the binder, that peaked investors' interest. Moreover, Leon does not contend that the interest the binder stirred up materialized into offers to invest or finance.  Leon's contentions tend to undermine Silverman's conclusion, but they do not show it to be methodologically problematic.

On Silverman's sixth opinion, that Leon fails to justify his projected office lease rates, Leon attempts to turn the tables and argue that Silverman fails to provide an opinion that such justification in a presentation binder is necessary.  It is unclear why this argument would require the opinion's exclusion.  Moreover, in his expert report, Silverman states that the value of a pro forma lies in its detail and reliability, see Silverman Report at 1, which is essentially an opinion on why Leon's failure to provide support for his lease rate projections is problematic.  To the extent that Leon argues that the pro forma were intended for a limited purpose that rendered such detail unnecessary, Leon is advancing a factual issue appropriately raised at trial.

The Court agrees in part with Leon on his challenge to Silverman's seventh opinion. Silverman's seventh opinion concludes that Leon's work was of little or no value, and that Leon should have known that the common practice in New Mexico is to have real estate agreements be in writing.  Leon contends that this conclusion consists of speculation, irrelevant opinions, and legal conclusions.  See Silverman Motion at 4-5.  To the extent that Silverman is reiterating his opinion that the pro forma Leon produced were not valuable, his testimony is admissible.  The Court will also allow Silverman to opine what is the common practice in New Mexico, as that evidence tends to prove whether there was an agreement in this case.  Silverman must be careful not to say that real estate contracts must be in writing, that he thinks that the law requires them to be in writing, or that the reason there is a common practice is because of any legal requirement.

Silverman's comment that "it [Leon's work] could be considered very damaging to the

Defendants both professionally with their financial relationships and their personal financial health," Silverman Report at 4 (emphasis added), is unclear.  Silverman appears to be saying that Leon's work is so shoddy that it could harm the Defendants.  This opinion states only a vague possibility and is thus excluded.  Silverman may, however, still give his opinions on the quality of Leon's pro forma.  Silverman's comments regarding "the claim that there was any agreement between the parties that [Leon] would participate in ownership of the project," is also inadmissible.  Id. Silverman may, to some extent, be making a legal argument.  His comments, however, seem to be more expressions of fact and custom.  Silverman's statement that real estate contracts should be in writing is phrased as being "common practice," which is different than Silverman asserting that Leon was legally required to have a written contract.  Id.  The comment is one on which expert testimony may not be necessary, but remains helpful to the jury.  Silverman may comment about the common practice among those involved in real estate development in New Mexico, but must be careful not to comment on what the law requires.

**IT IS ORDERED** that: (i) Plaintiff's Motion to Exclude Testimony of Thomas Burrage is granted in part and denied in part; (ii) the Plaintiff's Motion to Exclude Testimony of Karen Marcotte is granted in part and denied in part; and (iii) the Plaintiff's Motion to Exclude Testimony of Paul Silverman is granted in part and denied in part.  Thomas Burrage may testify at trial, but his opinions that state legal conclusions will be limited as discussed in this opinion.  Karen Marcotte may testify at trial, but she must testify as a lay witness regarding the January 18, 2007 meeting.  Paul Silverman may testify at trial, but his speculation and legal conclusions will be limited as discussed in this opinion.

UNITED STATES DISTRICT JUDGE

*Counsel*:

Thomas L. Grisham
Stephen F. Lawless
Grisham & Lawless P.A.
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

John M. Eaves
Karen S. Mendenhall
Eaves & Mendenhall, P.A.
Albuquerque, New Mexico

> *Attorneys for the Defendants*

-44-